# In the United States Court of Federal Claims

No. 09-549

(Filed: July 14, 2010)

* * * * * * * * * * * * * * * * * * * * * * *

BOARD OF COUNTY COMMISSIONERS
OF THE COUNTY OF BERNALILLO,
NEW MEXICO,

        *Plaintiff*,

v.

THE UNITED STATES,

        *Defendant*.

* * * * * * * * * * * * * * * * * * * * * * *

Contracts; partial termination; unilateral modification; notice of termination; breach; *Kisco*.

    *John G. Stafford, Jr., Joseph J. Summerill*, and *David P. Goodwin* Washington, D.C., for plaintiff.

    *Stacey K. Grigsby*, United States Department of Justice, Civil Division, Commercial Litigation Branch, Washington, D.C., with whom were *Tony West*, Assistant Attorney General, *Jeanne Davidson*, Director, and *Deborah Bynum*, Assistant Director, for defendant.

_____

OPINION

_____

BRUGGINK, *Judge*.

    This suit concerns the interpretation of a contract for the detention of federal prisoners in a county-owned correctional facility. Plaintiff contends that the United States partially breached the agreement and seeks to recover damages arising from the breach. Currently pending is plaintiff's motion for judgment on the pleadings pursuant to Rule 12(c) of the Rules of the Court of Federal Claims (RCFC). Also before the court is defendant's cross-motion for summary judgment pursuant to RCFC 56. The motions have been fully

1

briefed, and we heard oral argument on May 4, 2010. For the reasons set forth below, we grant plaintiff's motion for judgment on the pleadings as to liability only and deny defendant's motion for summary judgment.[1]

## BACKGROUND[2]

This dispute arises from an inter-governmental contract between the Office of the Federal Detention Trustee ("OFDT" or "the government") and the Board of County Commissioners of the County of Bernalillo, New Mexico ("Bernalillo County" or "the county"). The OFDT is a component of the United States Department of Justice and is responsible for entering and overseeing contracts with state and local entities to provide detention services for persons in the custody of various federal law enforcement agencies. On March 25, 2005, the OFDT entered into such an agreement with Bernalillo County. The six-year contract, Intergovernmental Agreement No. ODT-I-5-0001 ("the contract"), provided for three federal components to house prisoners at the Regional Correction Center ("RCC" or "the facility") in Albuquerque, a jail owned by Bernalillo County and operated through its subcontractor, Cornell Companies, Inc. ("Cornell").

The contract contemplated housing detainees who were in the custody of Immigrations and Customs Enforcement ("ICE"), the United States Marshals Service ("USMS"), and the Bureau of Prisons ("BOP"). In exchange, Bernalillo County received a per diem rate for each detainee. The contract set an initial per diem rate of $59.74 per prisoner and provided for this rate to be subsequently adjusted based on operating expenses and certain indices.[3] The contract estimates the number of detainees for two of the three federal agencies, and, more significantly, promises a minimum of 182,500 "Guaranteed Federal Jail Days Annually."

---

[1] This opinion grants plaintiff's motion as to liability only. We reserve deciding the appropriate award of damages until after that issue is briefed by the parties.

[2] These facts are drawn from the parties' Proposed Findings of Uncontroverted Facts ("PFUF") and briefs and are undisputed unless otherwise noted.

[3] The contract was modified in 2007 and again in 2008, raising the per diem rate to $63.72 and $67, respectively.

Three of the contract's provisions are of import. One is the modification clause, which provided that the "Agreement, or any of its specific provisions, may be revised or modified by signatory concurrence of the undersigned parties, or their respective official successors." The contract also contained a termination provision, which provided that the "Agreement shall terminate upon one hundred and eighty days (180) advanced written notice to the other party." Additionally, the contract contained provisions requiring that conditions at the RCC comply with certain industry standards and guidelines. To ensure compliance with these standards, the contract provided for periodic inspections of the facility and specified the areas that would be inspected to determine whether the RCC housed federal detainees in accordance with the contract.

In the contract's first year, the government used fewer than the guaranteed 182,500 jail days. Accordingly, at the conclusion of the 2005–06 contract year,[4] Bernalillo County submitted an invoice in the amount of $2,609,801.64 for the shortfall between the jail days actually used and the guaranteed annual jail days. The government paid the invoice in full.

In the fall of 2006, the OFDT conducted a review of the RCC's operations, concluding that the facility was "At-Risk." In this review, the government identified five specific areas in which the RCC did not comply with the standards specified in the contract. The review also revealed that RCC staff had failed to perform appropriate counts of detainees and had inadequate procedures for securing and supervising the tool area. Five months later, the government again reviewed the RCC. In this review, the facility received an "Acceptable" rating, although it continued to fall short in four of the five areas identified in the previous review.

Early in the second year of the contract, the Chief Judge of the local United States District Court visited the RCC. She subsequently sent a letter to ICE describing the conditions at the facility as "appalling," outlining various deficiencies, and suggesting immediate investigation and attention. In response, the Department of Homeland Security dispatched employees to conduct a two-day review of the RCC. This review, like those before it, concluded that the facility did not meet contractually-specified detention standards, this time listing thirty-one areas of shortcoming.

---

[4] The contract year runs from March 25 of one year until March 24 of the next.

Following this review, on July 3, 2007, the OFDT wrote to Bernalillo County, stating that "the Federal Government is considering Terminating or reducing the guaranteed annual jail days under our agreement for the use of the [RCC]." Def. PFUF, App. at 11. The letter further stated that it "should be considered formal notice under the Termination of Agreement Provision and the Failure to Perform Required Services provision." *Id.* The letter noted concerns expressed by ICE, the USMS, and the Chief Judge. Shortly after issuing this letter, ICE conducted a follow-up review of the RCC, rating it "At-Risk" or "Deficient" in five areas. Several months later, in November 2007, an ICE contractor conducted an inspection of the facility, recommending an "Acceptable" rating, but noting continued non-compliance in three areas.

On February 27, 2008, OFDT wrote Bernalillo County to inform it that ICE would no longer house detainees at the RCC. Accompanying this letter was a unilateral modification purporting to remove ICE from the contract and reduce the guaranteed annual jail days by nearly two-thirds. The modification states, "The purpose of this modification is to remove Immigration and Customs Enforcement from the current Intergovernmental Agreement. Accordingly, the Federal jail days have been reduced from 182,500 to 66,300 annually. All other terms and conditions remain unchanged." Amend. Comp. Ex. 6.

At the conclusion of the 2007-08 contract year, the government had used fewer than the originally guaranteed number of annual jail days. Accordingly, Cornell, the county's subcontractor, submitted an invoice to the Department of Homeland Security for $2,091,927.60 to recover the shortfall. When the government did not respond to this invoice, Cornell submitted a certified claim to Bernalillo County under the Contract Disputes Act of 1978 ("CDA"). The county in turn certified, sponsored, and submitted the CDA claim to the government's Contracting Officer and requested a final decision. No decision was forthcoming.

In the 2008-09 contract year, this cycle repeated itself, when the government again used fewer than the guaranteed annual jail days, failed to respond to an invoice for $2,124,669.75, and failed to issue a final decision on the subsequent CDA claim.[5] On August 19, 2009, Bernalillo County filed suit

---

[5] The contract is due to expire on March 25, 2011. Though the contract is ongoing, counsel has informed the court that in the 2009-10 and current contract years, the government has supplied sufficient BOP and USMS

in this court claiming partial breach of contract and seeking payment of the shortfall invoices.

DISCUSSION

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Here, the county and the government have moved for judgment under RCFC 12(c) and 56, respectively.[6] The parties do not dispute any of the material facts, but merely the interpretation of the contract. Interpreting a contract is a question of law amenable to summary judgment. *Varilease Tech. Group, Inc. v. United States*, 289 F.3d 795, 798 (Fed. Cir. 2002) (citing *Textron Def. Sys. v. Widnall*, 143 F.3d 1465, 1468 (Fed. Cir. 1998)).

When deciding a motion for judgment on the pleadings, we may examine "the content of the competing pleadings, exhibits thereto, matters incorporated by reference in the pleadings, whatever is central or integral to the claim for relief or defense, and any facts of which the . . . court will take judicial notice." *Curtin v. United States*, 91 Fed. Cl. 683, 687 (2010) (quoting *Crusan v. United States*, 86 Fed. Cl. 415, 417 (2009)). "A party may present facts outside of the pleadings when bringing or resisting a motion for judgment on the pleadings; upon consideration of these materials the court would then treat the motion as one for summary judgment under RCFC 56." *Boyer v. United States*, 84 Fed. Cl. 751, 753 (2008) (citing RCFC 12(d)).

In its complaint, Bernalillo County alleges that the government breached the terms of the agreement and violated the implied covenant of good faith and fair dealing. The county characterizes the government's attempt to alter the contract as a unilateral modification in violation of the contract's modification clause. In response, the government seeks to characterize its conduct as a partial termination of the contract, which it argues is permitted

---

inmates to meet the contract's guaranteed annual jail days.

[6] The standard for a motion under Rule 12(c) is the same as under Rule 56: "Judgment on the pleadings is appropriate where there are no material facts in dispute and the [moving] party is entitled to judgment as a matter of law." *Forest Labs., Inc. v. United States*, 476 F.3d 877, 881 (Fed. Cir. 2007).

under the contract's termination clause. In the alternative, the government argues that its removal of ICE detainees and subsequent refusal to pay the shortfall invoices is excused by the county's prior material breach related to the failure to meet the detention standards.

*I.    The government's ongoing refusal to pay the shortfall invoice is a breach of its contractual duty.*

There is no question that at the contract's inception the government guaranteed a minimum of 182,500 federal jail days annually. This guarantee obligated the government to pay for the minimum jail days even if it used fewer days. In essence, this guarantee set a floor that the government could exceed but not fall below. In several of the years preceding this suit, the government used fewer jail days than the minimum guarantee. The OFDT recognized its obligation and paid the shortfall invoice for the 2005-06 contract year. In the 2007-09 contract years, however, the government has refused to pay for the shortfall. Rather, the government claims to have contractually reduced the number of guaranteed federal jail days and thus been relieved of the obligation to pay the shortfall invoices.

The government relies on two letters which, taken together, purport to alter the number of guaranteed days. The first, sent by the OFDT on July 3, 2007, stated that "the Federal Government is considering Termination or reducing the guaranteed annual jail days under our agreement for the use of the Regional Correction Center (RCC)." Def. PFUF, App. at 11. Despite the inherent uncertainty in that statement, the letter concluded by stating, "This should be considered formal notice under the Termination of Agreement provision and the Failure to Perform Required Services provision." *Id.* The second letter, dated February 27, 2008, contained "Modification Number 5" and stated that ICE detainees had been removed and the "Federal Government jail days have been reduced from 182,500 to 66,300." *Id.* at 12.

This purported alteration, which was made unilaterally, was clearly not a proper modification because the county did not agree to it. The government, however, claims this alteration was proper as a partial termination. We are not persuaded. The contract does not allow for a partial termination and, even if it did, the government failed to properly terminate that part of the contract. As explained more fully below, the language of the contract's termination clause, whether viewed in isolation or in context indicates this was a unitary and indivisible contract not susceptible to partial termination.

6

### A. The contract does not allow for a partial termination.

As a general rule, contracts are presumed to be indivisible. *Stone Forest Indus., Inc. v. United States*, 973 F.2d 1548, 1552 (Fed. Cir. 1992) ("There is a presumption that when parties enter into a contract, each and every term and condition is in consideration of all the others, unless otherwise stated."). This rule presumes "that when parties negotiate and execute a single contract with multiple performances or conditions, unless the parties so indicate, it should be assumed that all the promised exchanges were simultaneous." *Nycal Offshore Dev. Corp. v. United States*, 92 Fed. Cl. 209, 212 (2010). Here, we can discern no reason to jettison this presumption of indivisibility.

#### 1. The plain language of the termination clause does not allow for a partial termination.

Courts "consider the language of a contract and the intent of the parties in determining whether a contract is divisible." *Amer. Sav. Bank, F.A. v. United States*, 519 F.3d 1316, 1325 (Fed. Cir. 2008) (citations omitted). It is well-established that when interpreting a contract, "terms are given their plain and ordinary meaning, unless the provisions are ambiguous." *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 824 (Fed. Cir. 2010). Here, the plain and ordinary meaning of the termination clause simply does not encompass partial terminations. The clause states in its entirety: "TERMINATION: This Agreement shall terminate upon one hundred and eighty days (180) advanced written notice to the other party." It is immediately apparent that this clause speaks of a single, indivisible agreement and a single termination. The singular and inclusive term—"This Agreement"—indicates that the clause provides a mechanism to terminate the agreement in its entirety.

The government concedes that the termination clause makes no mention of partial termination but argues that this silence operates as tacit consent. We disagree and will not read into the termination clause language that is not there. "Without clear support in the contract document and in the intent of the parties, a contract that is written as a unitary package shall not be severed into parts in order to favor the breaching party." *Stone Forest*, 973 F.2d at 1553. Here, there is no such clear support and we will not create a clause out of whole cloth.

In fact, the government's arguments on this point merely reinforce our conclusion that the contract does not allow for partial termination. The government thoroughly parses the meaning of "termination" and "modification" and argues that, according to their plain and ordinary meanings, their use in the contract allows for partial termination. We recognize that a termination is "the action of putting an end to something or bringing something to a close." Def. Reply at 2 (quoting 2 *The New Shorter Oxford English Dictionary* 4254 (4th ed. 1994)). Likewise, we concur that modification is "a concept short of termination," for example a "change or alteration to a contract." *Id.* (quoting *Black's Law Dictionary* 1025).

Having defined these two words, however, the government reaches two *non sequiturs*, one general and the other specific to this situation. The first is that these definitions prove that the concept of termination necessarily includes partial termination. Nothing in these definitions lends support to that idea. Rather, they indicate that an alteration that is less than a total termination is best considered a modification. The government's second *non sequitur*, which is related to the first, is that its conduct here is properly classified as a termination rather than a modification. Again, however, the cited definitions clearly indicate that an alteration short of termination is a modification, which here required the consent of both contracting parties. Thus, these definitions merely support our conclusion that the government's conduct cannot be a partial termination because the plain language of the termination clause does not allow for a partial unilateral termination.

> 2. *Other language in the contract supports the conclusion that the contract does not allow for a partial termination.*

When viewed as a whole, the contract supports the interpretation that the termination clause does not allow for partial termination. First, the guaranteed federal annual jail days—the figure at the very core of this dispute—is given as a unitary number. It is not itemized or otherwise divided. Second, the parties clearly knew how to use language that allowed for limited or partial changes. The modification clause, located immediately prior to the termination clause, states that "This Agreement, *or any of its specific provisions*, may be revised or modified . . . ." (Emphasis added.) This sort of language, which is notably absent from the termination clause, allows for an alteration that affects less than the entire contract. Had the contract intended to allow for a partial termination, similar language doubtless would have been included in the termination clause. It was not. Thus the language of the

contract, when considered in its entirety, reinforces our conclusion that the contract does not allow for partial termination.

> 3. *The history behind this contract and others like it indicates that it does not allow for a partial termination.*

In addition to the plain wording of the contract, the historic development of OFDT detention contracts demonstrates that partial termination is not an option. The government argues that partial terminations are typically allowed in the context of government contracting. Specifically, the government states "[t]hat *most* Government contracts contain both a termination clause, which permits partial termination, and a modification clause . . . ." Def. Reply at 4 (emphasis added). The government, however, concedes that this standard clause is missing here and that this contract is not subject to the Federal Acquisition Regulations ("FAR") provisions that typically allow for partial termination of government contracts. *Id.* n.2. The government further candidly concedes that such inter-governmental agreements for prison services were specifically exempt from the usual regulations. *Id.*

Historically, federal law enforcement entities have been largely, and sometimes entirely, dependent on state and local entities to house federal prisoners. *See id.*, app. 1 (correspondence between Department of Justice and the Office of Management and Budget). State and local entities, leveraging the strength of this bargaining position, often refused to enter into contracts to provide detention services unless those contracts were exempt from otherwise mandatory procurement and assistance regulations. *Id.* In 1982, at the request of the Department of Justice, an exception was granted for all such contracts.[7] *Id.* Because OFDT detention contracts, including this one, are expressly not subject to the standard FAR provisions, the government's argument based on those provisions falls short. Like the language of the contract, the history of this and similar contracts reveals that partial termination is not an option.

---

[7] At oral argument, counsel for the government conceded that this exemption was valid and legally granted. Accordingly, the government does not argue that the standard FAR termination clause should be incorporated into the contract per the "*Christian* doctrine." *See Gen. Eng. & Mach. Works v. O'Keefe*, 991 F.2d 775, 779 (Fed. Cir. 1993) ("[U]nder the *Christian* Doctrine a court may insert a clause into a government contract by operation of law if that clause is required under applicable federal administrative regulations.").

> B.   *Even if the contract allowed for a partial termination, the government failed to properly terminate that part of the contract.*
>
> 1.   *The July 3, 2007 letter failed to give sufficient notice.*

Assuming *arguendo* that the contract allowed for partial termination, the government failed to give notice as mandated by the termination clause. The purported "notice" was so vague as to be insufficient to put the contractor on notice of the impending termination. The law regarding the requisite clarity of a notice to terminate is surprisingly sparse. The parties cite three cases on the issue, none of which are entirely on point. Certainly at a minimum, however, a notice of termination must be sufficiently explicit and definite to notify the contractor that a settled decision has been made to terminate the contract. *See Ra-Nav Labs., Inc. v. Widnall*, 137 F.3d 1344, 1347-48 (Fed. Cir. 1998) (emphasizing the clarity of the termination notice and stating that such communiques should be "clear and unequivocal").

Here, the crux of the notice issue is the OFDT's July 3, 2007 letter. The letter's first sentence stated that "the Federal Government is considering Terminating or reducing the guaranteed annual jail days." This statement is problematic for at least two reasons. First, it fails to give notice of whether the government will be taking any action. Rather, it merely states that the government is *considering* taking action. Notice of contemplation is not the same as notice of termination. Second, the letter fails to give notice as to what particular action the government will take, if any. The OFDT appeared to be considering several options, including terminating the contract *or* reducing the guaranteed days, but apparently had not yet elected which course to pursue.

The government argues that the letter's second sentence constitutes notice: "This letter should be considered formal notice under the Termination of Agreement provision and the Failure to Perform Required Services provision." In our view, however, this sentence merely added yet another layer of uncertainty to the OFDT's intentions. It demands the question: formal notice of what? Notice of termination seems implausible in light of the surrounding sentences, which contemplate future action. Further confusing the

issue is the reference to the "Failure to Perform Required Services" provision, a provision not found in the contract.[8]

The letter's final sentence underscores our conclusion that the letter was insufficient notice. It states, "We understand the facility is working toward compliance with the agreement, however, we believe it is prudent to reserve our rights." A reservation of rights, which allows a party the option of taking action later, is quite different from a notification of termination. Taken together with the deficiencies already noted, this letter failed to provide clear notice of the government's intended action. In sum, even if the contract allowed for partial termination, the OFDT's "notice" letter failed to provide notice of the intended termination and thus failed to properly terminate any part of the contract.

Of the three cases cited by the parties, the most relevant is *Kisco v. United States*, 610 F.2d 742 (Ct. Cl. 1979). In *Kisco*, the plaintiff was a manufacturer located in a region of high unemployment. *Id.* at 744. It entered a contract with the Department of Labor ("DOL") that obligated it to hire, train, and employ a specific number of "eligible disadvantaged persons," the cost of which would be reimbursed by the DOL. *Id.* at 744-45. Within the first year, the DOL was not satisfied with Kisco's performance. *Id.* at 746-47. Approximately one year into the contract, the DOL sent a letter purporting to partially terminate the contract. *Id.* at 747-48. The letter stated in pertinent part:

> The U.S. Government hereby partially terminates [the contract], as performance has been unsatisfactory . . . . This partial termination is in accordance with the terms of the contract, Clause 9. You shall not start any new hires under this contract or place any orders in connection with the contract until a satisfactory modification is agreed upon as a result of renegotiation.

---

[8] The nearest to any such provision is the "Performance Requirements Summary" found in attachment 1 to the contract. This attachment, however, makes no mention of termination or reduction. Rather, it allows for the detention invoices to be reduced in specified percentages for enumerated deficiencies. This, in fact, appears to be the course the government should have followed to address its concerns at the RCC.

11

*Id.* Upon receipt of this letter, the contractor continued operations, though apparently suspending new hiring and ordering. Six months later, after fruitless negotiations between the parties, the contract was terminated for default. *Id.* at 749.

The *Kisco* court found that the purported termination letter was ineffective and converted the termination into a termination for convenience of the government. *Id.* at 750. The court noted that the supposed notice letter was "so internally confusing and so much a departure from standard Government contracting procedures, that the plaintiff may not have had the faintest idea of how to treat it."[9] *Id.* at 752. The court approved of Kisco's "wait-and-see approach, which seem[ed] reasonable given the lack of finality inherent in the notice and the invitation to further negotiate." *Id.*

Here, Bernalillo County cites *Kisco* in support of its contention that a vague or internally inconsistent letter is insufficient to provide notice. We agree that *Kisco*, while not entirely parallel, is sufficiently similar to warrant reliance on its reasoning on this point. The government, however, points to the fact that the *Kisco* court converted the termination to one for convenience and claims that *Kisco* stands for the more general proposition that this type of letter satisfies the requirements of a general termination clause.

The problem with the government's argument—apart from contradicting the *Kisco* court's reasoning—is that *Kisco* is in several respects distinguishable from the case here. First, the contract in *Kisco*, unlike the one here, was subject to and interpreted in light of federal contracting regulations. Second, the contract in *Kisco* explicitly allowed for a termination for convenience.[10] Here, there is no such provision. Third, the *Kisco* contract

---

[9] In addition to the letter's internal contradictions, the Court noted that it failed to comply with various requirements, including a 10-day cure opportunity, mandated by the contract and by the then-extant Federal Procurement Regulations.

[10] The court quotes the contract's clause thirteen, which stated "[t]he Contracting Officer by written notice, may terminate the contract, in whole or in part, when it is in the best interest of the Government." *Id.* at 746.

specifically allowed for partial termination.[11] As already discussed, the contract here does not. Finally, the purported notice letter in *Kisco* was actually more explicit than the one here. If that letter was insufficient notice, then the one here surely is insufficient.

> 2. *The government did not wait the requisite 180 days before ceasing its performance.*

Even if the contract permitted partial termination, and even if the government had provided sufficient notice of termination, the government's speedy removal of the ICE detainees belies its contention that this was a proper termination. The contract's termination clause requires that a written notice precede the termination by 180 days. The government's brief, however, acknowledges that "a little over a month after [the] letter, the Government took steps to effectuate the termination" by removing all ICE detainees. Def. Reply at 6. The OFDT did not handle this action in accordance with the terms of the termination clause.

II. *Conditions at the RCC were an insufficient basis to justify the government's ongoing breach.*

While conditions at the RCC may have been problematic, that is an insufficient basis to justify the government's ongoing refusal to abide by the contract's terms. The government could have legitimately exercised several options in response to the problems at the RCC. For example, the contract allows the government to terminate the entire contract per the termination clause or to specify a reduction in the payment amount per the reduction clause. Instead, the government created a third, extra-contractual option: unilaterally changing the terms of the contract.

The government, however, claims its conduct, even if wrongful, was justified under the doctrine of prior material breach. That doctrine provides that "when a party to a contract is sued for breach, it may defend on the ground that there existed a legal excuse for its nonperformance at the time of the alleged breach." *Barron Bancshares, Inc. v. United States*, 366 F.3d 1360,

---

[11] The court quotes the contract's clause nine, which stated "the Contracting Officer may cancel the contract, in whole or in part, upon written notice to the Contractor and his failure to remedy such condition within 10 days of receipt of such notice." *Id.* at 745.

1380 (Fed. Cir. 2004) (citing *Coll. Point Boat Corp. v. United States*, 267 U.S. 12, 15 (1925)).  Here, the government claims that the RCC's failure to meet detention standards excused the government's nonperformance.

The difficulty with this argument, however, is that the government continues to house prisoners at the RCC to this day.  When a contracting party is faced with a material breach by the other party, it has a choice of continuing or ceasing performance.  *Barron Bancshares*, 366 F.3d at 1382–83.  "In order to preserve its claim of a prior material breach giving rise to the right to terminate the contract, the government had to treat [the contractor] as if it had breached the contract." *Id.* at 1383 (citing 14 *Williston on Contracts* § 43:15 (4th ed. 2000)).  Where, as here, the government continues performance, it waives the right to assert the defense of prior material breach.  *See id.*

The government explains its actions by claiming that there were different standards for different detainee populations, *i.e.*, that ICE's detention standards were more rigorous than the USMS's or the BOP's.  Accordingly, the government sees no incongruity with continuing to house prisoners at the RCC while simultaneously claiming prior material breach with respect to the ICE detainees.

The government's argument on this point, however, is not supported by the terms of the contract.  Specifically, the contract contains no indication that different detention standards apply to different detainee populations.  Rather, the contract requires that the prison comply with all of the listed standards regardless of which agency detained the inmates:

> Unless otherwise specified by this Agreement, Bernalillo County is required, in units housing Federal detainees, to perform in accordance with the most current editions of the <u>Reviewers Guide which contains Standards of Performance, ICE Detention Requirements, American Correctional Association (ACA) Standards for Adult Local Detention Facilities (ALDF),</u> and <u>Standards Supplement, Standards for Health Services in Jails, latest edition, National Commission on Correctional Health Care (NCCHC).</u>

(Emphasis in original.)  This requirement, which by its terms applies to all federal prisoners, mandates compliance with all the listed standards.  In particular, the use of the conjunction "and" indicates that the RCC must satisfy

each of the enumerated standards in every unit housing federal detainees regardless of the detainees' agency origin. We cannot conclude that a separate standard applied to ICE detainees. Thus, the government is foreclosed from claiming prior material breach while continuing to house prisoners in the same conditions that constitute the alleged prior breach.

Even if different standards applied to different prison populations, the government waived the right to challenge the deficient performance with regard to the ICE detainees. The government waives its right to argue prior breach "by conduct or actions that mislead the breaching party into reasonably believing that the rights to a claim arising from the breach was [sic] waived." *Westfeld Holdings, Inc. v. United States*, 407 F.3d 1352, 1361 (Fed. Cir. 2005). Here, ICE continued housing prisoners at the RCC for 11 months after becoming aware of the facility's deficiencies.[12] During this 11-month period, the RCC worked to remedy the noted deficiencies, and subsequent inspections noted the improvements at the RCC.

We note that the contract provided a mechanism for the government to address any shortcomings of the RCC. The contract's "reduction clause," appended to the original contract as "Attachment #1," allowed the government to "reduce the invoices or otherwise withhold payment for any individual item of nonconformance observed." It further noted that "[a]ny reductions in the invoices shall reflect this Agreement's reduced value resulting from the failure to perform required services." This clause allowed the government to reduce an invoice by specified percentages for specific, enumerated issues. For example, a failure to comply with "Tool & Equipment Control" could result in a maximum 20% invoice reduction, while inadequate "Diversity Training" could be penalized with a 2.5% reduction.

Rather than proceed under this clause, however, the OFDT purported to alter the contract's terms and refused to pay the shortfall invoices. While the government was entitled to enforce the reduction clause, it chose not to do so and cannot now rely on this clause to justify its wrongful conduct. The government had, and still has, a choice: it can terminate the contract or it can continue to perform, including satisfying the minimum guaranteed annual jail

---

[12] The government became aware of the deficiencies at the RCC in September 2006 when it received an "At-Risk" rating. Def. Reply at 11. It was not until August 2007, however, that ICE removed its detainees from the RCC. *Id.*

days. If, however, it wishes to continue to benefit from any of this contract, it must shoulder its responsibilities for the entire contract. It cannot unilaterally modify the contract under the guise of a partial termination.

## CONCLUSION

For the reasons stated above, plaintiff's motion for judgment on the pleadings is granted as to liability. Defendant's cross-motion for summary judgment is denied. Entry of judgment is deferred pending briefing and decision on the issue of damages.

s/ Eric G. Bruggink
Eric G. Bruggink
Judge
